# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| DARLA M. DUNCAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:13-CV-01147-NKL |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

**ORDER**

Plaintiff Darla Duncan seeks review of the Administrative Law Judge's decision denying her application Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* [Doc. 7]. Duncan's alleged disability onset date is January 13, 2011. For the following reasons, the decision of the Administrative Law Judge (ALJ) is REVERSED, and the case is remanded for the purpose of awarding benefits to Duncan.

## I.  Background

Duncan, forty-four years old at the time of her application date, has a seventh grade education which was accomplished through participation in special education classes. Duncan has a long history of mental illness which has been variously diagnosed as bipolar disorder, depression, anxiety, borderline personality disorder, and post-traumatic stress disorder. She has experienced some or all of these illnesses since

1

childhood and has been on medication since 1996. [TR-924]. The illnesses manifest through extreme mood swings, violent behavior toward herself and property, hypersensitivity, paranoia, hallucinations, and suicidal thoughts. *See e.g.*, [TR-434, 662, 672, 923]. Duncan also has a history of fibromyalgia.

In the summer and fall of 2010, she reported living intermittently in a public park, [TR-440], and a homeless shelter, [TR-437], before securing transitional housing. Beginning in May 2011, Duncan received assistance from a community social service (CSS) worker. The CSS worker visited or called Duncan on average every 3-5 days with frequent visits and calls every day or every other day. [TR-601-702, 738-89, 887-921]. During these visits, which typically lasted between thirty minutes and almost three hours, the CSS taught Duncan coping skills, helped her access housing, medication, and food resources, helped fill out paperwork, coordinated medical appointments, discussed medication scheduling, assisted with meal planning and shopping, encouraged her to leave her home, and discussed how to interact appropriately with others. Common objectives included emotional processing, learning and processing coping skills and social skills, and learning and utilizing sleep and hygiene practices. Duncan also received assistance from a home health worker who cooked and portioned meals for her, helped her clean her house, and took her to medical appointments. *See e.g.*, [TR-689, 899].

Medical reports beginning around April 2010 reveal that Duncan frequently experienced anxiety, depression, racing thoughts, crying spells, and violent outbursts. She reported feelings of paranoia associated with her belief that her daughter's father

stalked her. [TR-428, 599, 736]. She also reported frequent hallucinations involving ghosts and voices. [TR-652, 599, 751, 782, 818]. She reported both loss of sleep and fatigue related to pain from fibromyalgia and from her racing thoughts. [TR-434, 599, 782]. Duncan was often compliant with her medication regimen, [TR-434, 652-3, 661, 735-36, 781-82], but sometimes forgot to take her medication, [TR-741]. She also experienced side effects such as hair loss, [TR-652], shaking, and imbalance, [TR-672]. Duncan was assessed with Global Assessment Functioning (GAF) scores in the 30s and 40s, [TR-398, 703-5, 886], frequently received a score of 50, [TR-440, 443, 446], and on two occasions received a score of 55-60, [TR-429, 435].

Beginning in April 2010, Duncan sought regular mental health treatment. In December 2010, her case was supervised by Dr. Umonoibalo Ehimare, M.D. In August 2012, after treating Duncan at least twelve times, Dr. Ehimare evaluated Duncan through a "Mental Residual Functional Capacity Assessment" and a "Mental Impairment Evaluation." [TR-922-28]. Dr. Ehimare opined that Duncan was moderately to mildly limited in her ability to understand and remember instructions and work-like procedures, moderately to extremely limited in her ability to maintain sustained concentration and pace, slightly to extremely limited in her ability to interact with coworkers, the public, and supervisors, and markedly to extremely limited in her ability to adapt to unfamiliar places or settings. [TR-922-23]. Dr. Ehimare stated that Duncan's "symptoms are characterized by episodes of extreme mood swings, affective instability, and psychotic symptoms." [TR-923]. Dr. Ehimare also stated that her functional capacity is severely limited by extreme mood instability and she has a tendency to decompensate even under

3

minimally stressful situations. *Id.* It was anticipated that Duncan would be absent from work more than three days per month. Dr. Ehimare also opined that Duncan met both Listing 12.04 and 12.06 as described in 20 C.F.R. Part 404, Subpart P, Appendix 1. Under the "B" Criteria, Dr. Ehimare stated that Duncan had moderate restrictions on activities of dialing living, but extreme restrictions in social functioning and maintaining concentration, persistence, and pace. She also had extreme repeated episodes of decompensation. [TR-925]. Dr. Ehimare also concluded that Duncan met the medical symptom requirements of both Listings 12.04(A) and 12.06(A). [TR-926-27].

Dr. Margaret Sullivan, Ph.D, a non-examining state agency consultant, filled out a "Psychiatric Review Technique" form and a "Residual Functional Capacity Assessment" in April 2011. [TR-548-61]. Based on a review of Duncan's records up to that point, Dr. Sullivan opined that Duncan had mild to moderate functional limitations and one or two repeated episodes of decompensation. [TR-556]. Dr. Sullivan remarked that Duncan responded positively to medication intervention and case services, continued to indicate irritability and mood problems, needed to be reminded to take medications when she was depressed, could follow some simple directions and do some household chores. [TR-558]. Based on this assessment, Dr. Sullivan opined that Duncan "appear[ed]" capable of unskilled tasks in an environment that is socially limiting. *Id.* Dr. Sullivan stated that Duncan was at most only moderately limited in understanding and memory, sustaining concentration and pace, social interaction, and adaptation. [TR-559-60].

CSS workers who worked with Duncan also submitted statements on Duncan's behalf. These statements indicated that Duncan experienced a lot of pain from

4

fibromyalgia, received services through an independent living company and personal care attendant, struggled with remembering tasks and chores, and feared change. *See e.g.*, [TR-122-23].

After a hearing, the ALJ issued an unfavorable decision, finding that Duncan could perform jobs that exist in significant numbers in the national economy. [TR-21-22]. Duncan had the residual functioning capacity (RFC) to perform light work except she is limited to simple unskilled work involving only limited contact with her coworkers and supervisors, and no contact with the general public. [TR-17].

To reach the RFC determination, the ALJ gave the non-examining state agency consultant's opinion "moderate weight." [TR- 20]. Dr. Ehimare's evaluation was given "little weight." *Id.* The CSS workers' statements were given "little weight" because they contradicted the medical record, Duncan's documented actions, and treatment notes and because neither CSS worker was an acceptable medical source. [TR-19-20]. The ALJ also remarked that Duncan refused individualized therapy, was not compliant with her medication, had a poor work history, and had relationships with men. [TR-19].

## II. Discussion

Duncan argues the ALJ did not properly consider Listing 12.04 and 12.06 and erred by giving little weight to Dr. Ehimare's opinions with regard to the Listings. The Court agrees. When determining whether a claimant is disabled, the ALJ must employ a five step process. *Hepp v. Astrue*, 511 F.3d 798, 803 n.4 (8th Cir. 2008); 20 C.F.R. § 416.920. At step three, the ALJ must determine whether the impairment is, or is comparable to, a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5

Listing 12.04 describes affective disorders and Listing 12.06 describes anxiety disorders. To meet Listing 12.04, requirements in 12.04(A) and (B) must be met or 12.04(C) must be met. To meet listing 12.06, requirements in 12.06(A) and (B) must be met or 12.06(A) and (C) must be met.

As to 12.04(A) and 12.06(A), the ALJ did not provide an assessment. However, the ALJ determined that Duncan did not meet the requirements in 12.04(B) and 12.06(B). The "B" Criteria in both Listings 12.04 and 12.06 require a finding of at least two of the following: 1) marked restriction of activities of daily living; 2) marked difficulties in maintaining social functioning; 3) marked difficulties in maintaining concentration, persistence, or pace; or 4) repeated episodes of decompensation, each of extended duration. The ALJ determined Duncan had mild restrictions in activities of daily living and moderate restrictions in social functioning and in maintaining concentration, persistence, and pace. [TR-15-16]. The ALJ found no evidence of episodes of decompensation. [TR-16].

The ALJ's finding is not supported by substantial evidence in the record. First, the ALJ failed to give Dr. Ehimare's opinions controlling weight. "A treating physician's opinion is given 'controlling weight' if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005). An ALJ may disregard or discount a treating physician's opinion where other medical assessments are supported by better or more thorough medical evidence or where the treating physician renders inconsistent opinions. *Id.* In any case, the ALJ must provide good reasons for the

6

weight given to a treating source's opinion. 20 C.F.R. § 416.927(c)(2); *see also Brown v. Astrue*, 611 F.3d 941, 951-52 (8th Cir. 2010). "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998); *see also Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010). This "is especially true when the consultative physician is the only examining doctor to contradict the treating physician," *Cox v. Barnhart*, 345 F.3d 606, 610 (8th Cir. 2003), or where the claimant suffers from a psychological disorder, as "one characteristic of mental illness is the presence of occasional symptom-free periods," *Brown*, 611 F.3d at 954.

Dr. Ehimare, who examined and treated Duncan multiple times over a period of almost two years, is Duncan's treating physician. Absent a good reason, his opinion should have been given controlling weight. The ALJ concluded that Dr. Ehimare's opinions were entitled "little weight" because his opinion

> is not consistent with his treatment notes which indicated her symptoms waxed and waned over time. Also, as the claimant did not comply with his treatment recommendations to attend therapy or comply with medications, any opinion by Dr. Ehimare concerning her condition is not representative of how the claimant would present if she was compliant. I give his opinion little weight because it is inconsistent with her varied activities of daily living, and her demonstrated ability to interact socially and adapt to multiple new housing situations during the alleged period of disability.

[TR-20]. This reasoning is unsupported by substantial evidence in the record.

Dr. Ehimare's opinion that Duncan had extreme limitations is not inconsistent with his treatment notes merely because the notes indicate Duncan sometimes improved. The evidence cited by the ALJ to presumably create the inference that she felt better at

7

times still shows mental deficiencies incompatible with full time work. For instance, the ALJ pointed to a record in August 2011 which states that Duncan reported doing better, was able to sleep longer, and eat more. However, the same record states she still experienced irritability, did not want to be around others, had racing thoughts, saw ghosts daily, and felt like her ex-boyfriend was stalking her. [TR-652-53]. Seven days earlier, Duncan reported poor sleep, anxiety, irritability, panic attacks, low energy, racing thoughts, and hallucinations. [TR-662]. A month later, Duncan's CSS worker noted that Duncan had been evicted from her apartment after she broke doors, punched holes in the walls, and broke windows. [TR-630]. Two months later, Duncan reported stress and thoughts of suicide. [TR-598]. Likewise, in March 2012, Duncan reported a "really good" appetite, "pretty good" energy, and concentration that was "getting better." [TR-736]. The same record states she still hallucinated two or three times per week and still experienced paranoid feelings. *Id.* A month later, Duncan was assessed a GAF score of 43. [TR-886]. Further, the Eighth Circuit has recognized that mental illness is characterized by symptom-free periods. *See Brown v. Astrue*, 611 F.3d 941, 954 (8th Cir. 2010).

  The ALJ also reasoned that because Duncan was not compliant with her medication or Dr. Ehimare's therapy recommendations, Dr. Ehimare's opinions were not representative of how Duncan could function if she were compliant. However, the record supports a finding that Duncan was regularly compliant with her medications and even when she was, she experienced anxiety, stress, irritability, hallucinations, and paranoia. [TR-434, 652-3, 661, 735-36, 781-82]. While the record does support a finding that

8

Duncan refused individual therapy, there is also evidence that Duncan often experienced difficulty leaving her home. [TR-887]. Further, Duncan did attend group therapy which, incidentally, the ALJ concluded was proof that she was only moderately socially limited. [TR-15, 639].

The ALJ also concluded that Dr. Ehimare's opinion was inconsistent with Duncan's varied levels of activities of daily living. The ALJ remarked that Duncan was able to live alone despite having a case manager, was once able to care for a cat, was once observed cooking chili and having a clean house, and was able to color, play video games, do puzzles, sew, and journal. [TR-15]. There is no requirement that a claimant must live in a group home or be totally dependent to be considered disabled. Nonetheless, the substantial evidence in the records supports a finding that Duncan heavily relied on the frequent services of her CSS worker and home health worker. She may have had a clean house, but the evidence does not support a finding that she cleaned it without help. [TR-689]. Likewise, while Duncan was cooking chili once, she requested assistance from her CSS worker in seasoning it, and other evidence suggests that her home health worker prepared most of her meals. [TR-121, 689]. Evidence that Duncan often colored, played games, and did puzzles is not indicative of an ability to work eight hours a day, five days a week. The ALJ also pointed to the fact that Duncan once babysat three children "from 6pm Friday night until 10am Sunday morning," but the ALJ overstated the extent of this endeavor as it was actually only until Saturday morning. [TR-889].

The ALJ also reasoned that Dr. Ehimare's opinion should be afforded "little weight" because it was inconsistent with Duncan's social abilities as evidenced by the fact that she got in trouble for having visitors in her home and had boyfriends. However, while Duncan expressed a desire to have people visit her in her own home, she often had to be encouraged to leave it. In June 2012, she told her CSS worker that she would not go out in the community or to friends' homes because she could not control the situation. [TR-887]. There is also evidence she had unhealthy relationships consistent with her mental problems. *See e.g.*, [TR-200, 423-24, 428, 917-18].

Lastly, the ALJ reasoned that Dr. Ehimare's opinion was inconsistent with Duncan's ability to adapt to new housing situations. However, the record contains several instances where Duncan expressed stress, anxiety, and frustration over moving. *See e.g.*, [TR-598, 609, 661, 665]. For example, in October 2011, Duncan appeared manic, had been up all night, slurred her words, was wearing dirty clothing, and reported falling from the stress of an impending move. [TR-609].

Moreover, Dr. Ehimare's opinions are largely consistent with the opinions of Duncan's CSS workers who remarked that Duncan relied on a home health worker to complete tasks such as shopping, cooking, and cleaning. [TR-122]. They remarked that Duncan feared meeting new people, had difficulty adapting, experienced pain due to fibromyalgia, could not sleep regularly, got overwhelmed easily, thought about ghosts, feared people would kill her, would not go out alone, could not handle finances, and did not handle stress well. [TR-121-28, 192-201]. The only evidence substantially contrary to Dr. Ehimare's opinion was that of a non-examining state agency consultant who

reviewed Duncan's records in April 2011. The consultant's assessment is not consistent with substantial evidence in the record. Dr. Ehimare's opinion was due great weight, and the ALJ erred by giving "little weight" to his opinion.

Dr. Ehimare's opinions aside, substantial evidence in the record supports a finding of disability. In the "A" Criteria of Listing 12.04, there is substantial evidence to support a finding that Duncan experiences sleep disturbances, [TR-431, 434, 662, 736], decreased energy, [TR-434, 662, 687, 782, 817, 887], thoughts of suicide, [TR-599, 672, 677, 747-49, 755-56, 887], and hallucinations, [TR-599, 653, 736, 747, 756, 782, 817, 887, 893]. She also experiences a decreased need for sleep, [TR-748, 78], flight of ideas/racing thoughts, [TR-432, 434, 441, 599, 672, 790], and paranoia, [TR-428, 599, 653, 673, 782]. In the "B" Criteria of Listing 12.04, there is substantial evidence to support a finding of at least marked restrictions in two areas of Duncan's functional ability. She relies heavily on the assistance of a CSS Worker and a home health worker to accomplish tasks like cleaning, grocery shopping, scheduling, and medication compliance, [TR-601-702, 738-89, 887-921]. She frequently resists leaving her home, [TR-122-23, 198-99, 418, 887, 889], she struggles to maintain healthy relationships with boyfriends or family members, [TR-200, 418, 428, 423-24, 430, 917-18], she must be reminded to take medication, [TR-197, 741], and she decompensates in minimally stressful situations, [TR-425, 598, 609, 661, 665].

Both Dr. Ehimare's opinion and substantial evidence in the record support a finding that Duncan – at least – met the requirements of Listing 12.04 and was therefore disabled beginning January 13, 2011. The ALJ's finding that Duncan was not disabled is

11

not supported by substantial evidence. Accordingly, the ALJ's decision is reversed and the case is remanded with instruction to award benefits.[1]

### III. Conclusion

For the reasons set forth above, the ALJ's decision is REVERSED, and the case is remanded for the purpose of awarding benefits to Duncan.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: August 4, 2014
Jefferson City, Missouri

---

[1] Duncan also alleges several other points of error. However, because the Court finds that the ALJ erred by not affording controlling weight to Dr. Ehimare's opinion and that substantial evidence in the record supports the conclusion that Duncan is disabled under Listing 12.04, the Court need not discuss Duncan's other points of error.